Ex Parte Coupland.

## Ex Parte F. H. Coupland.

The respondent to a writ of habeas corpus must produce the body of the person alleged to be illegally detained, before the judge or court issuing the writ, if in his custody or under his control at the service of the writ, unless excused from so doing by the cirumstances indicated in art. 149, Code Criminal Procedure; and a return not accompanied by the body will be scanned with great caution.

If a party has been released from custody previous to the service of the writ, its object and purpose has been accomplished, and the court will make no order on the subject.

A different rule prevails when the court has obtained jurisdiction by service of the writ; when once obtained, it cannot be defeated by the wrongful act of either party.

The object of the writ is to relieve the party from illegal restraint, and not to afford him redress for the illegal restraint.

Ex Parte Coupland.

Upon the hearing of an appeal in cases of habeas corpus, the applicant need not be personally present in the appellate court.

The rule of the court, not to hear appeals in criminal causes when the defendant has escaped, is merely a rule of practice, depending, in its application to particular cases, upon the discretion of the court.

A party's right to a writ does not depend upon the legality or illegality of his original caption, but upon the legality or illegality of his present detention.

The Act of the Confederate Congress, entitled "An Act to provide for the public defence," approved April 16th, 1862, commonly known as the "Conscript Law," is constitutional.

It is a general proposition that it is incumbent upon those who maintain the constitutionality of an act of the Confederate Government, to show that the authority assumed by the Confederate States is sanctioned by an expressly delegated power, or that the act itself is necessary and proper for the carrying into effect an expressly delegated power.

In determining the constitutionality of a law passed by the Confederate Government, it is important to consider whether the act in question is done in the exercise of a power expressly granted, or under the implied powers granted by the 18th paragraph of the 8th section of the 1st article of the constitution ; if it is the first, then the Confederate Government may use its discretion in the mode and manner of its exercise, unless it is limited or restrained in so doing by some other express provision, or by some clear and necessary implication ; and the burthen of showing this is upon those who assert the limitation.

The authority given " to make all laws which shall be necessary and proper for carrying into execution " the expressly granted powers, was not intended merely to authorize congress to exercise by legislation the powers previously granted ; its right to do so depends in no manner upon this clause, but it is itself a direct grant of all such subsidiary and incidental powers as shall be " necessary and proper " to carry into effect the previously granted powers ; and it is incumbent upon those who maintain it to show, not merely that it is a " necessary " law, but that it is a " necessary and proper " law for carrying into effect the expressly granted power.

If there were no express grant " to raise and support armies," the right of the Confederate Government to raise and support armies could be sustained under the general granting clause contained in the 18th paragraph, 8th section, article 1 of the constitution ; and the law in question is in strict accordance with it.

The " power to raise and support armies " is an express constitutional grant to the congress of the Confederate States ; and there is no limitation as to the mode or manner of exercising it, by any other express provision, or by any necessary implication.

The Conscript Law does not violate any of the abstract or guaranteed rights of the citizen, nor assume over him any control not delegated by the constitution.

The grant of the power to make war, carries with it, by necessary implication, unless expressly withheld, the right to demand compulsory military service from the citizen; this express power, together with the implied powers, is vested in the Congress of the Confederate States.

The power to call out the militia, which is a compulsory service, does not limit the power to raise and support armies; nor is the right to raise and support armies to be taken in subordination to the power conferred over the militia.

The General Government is not dependent upon the will either of the citizen or of the State, to carry into effect the power to raise and support armies.

While both the Confederate Government and the State Government possess some of the powers which are called by law-writers in distinguishing different forms of government, "sovereign powers," neither of them are themselves sovereign, but each of them represents the sovereign, and both have within their mutual spheres of action just such powers and functions as have been conferred upon them by the constitutions creating them.

Congress can exercise, in its judgment and discretion, the "power to raise and support armies," to the extent of raising and supporting such armies as are absolutely essential to enable it to carry into effect the powers granted to it; beyond this Congress cannot go; so long as the necessity exists, the exercise of the power is constitutional; when the necessity ceases to exist, its continuance would be unconstitutional.

Mr. Justice Bell concurred in the opinion of the court upon the questions of practice, but dissented as to the constitutionality of the Conscript Law, for the reasons assigned in his opinion.

APPEAL from the judgment of Chief Justice Wheeler, sitting in chambers at Austin.

The facts appear in the opinion of the court.

*Hancock & West*, for appellants.

*Attorney-General*, for appellee.

MOORE, J.    The relator (Coupland) applied to the Chief Justice on the 16th of July, 1862, in vacation, for a writ of habeas corpus, alleging that he was illegally restrained of his liberty by R. T. P. Allen, in Travis county, as he believed, "without any order or process whatever, or any color of either." The writ issued, and Allen made return, that the relator was placed originally in his custody by order of R. J. Townes, Provost Marshal

Ex Parte Coupland.

of Travis county; but that before the service of the writ upon him, the relator had been enrolled as a soldier of the Confederate States, as a conscript, under the Act of the congress of the Confederate States, entitled "An Act to further provide for the public defence," and had selected his company, been attached to it, and had been discharged from his original detention; and at the service of the writ was only detained as a soldier of the Confederate States, belonging to a regiment of which respondent was colonel. On the hearing, the relator was remanded into the custody of the respondent. From this judgment the relator prosecutes this appeal.

The first question for our decision arises upon a motion by the Attorney-General, who appears on behalf of the respondent, Allen, that the application should for the present be continued, because, as he alleges, the relator, since he was remanded by the judgment of the Chief Justice into the custody of the respondent, as a soldier in the regiment of which he was in command, has deserted, and is no longer in the custody or under the control of the respondent. This motion is founded on an affidavit of a lieutenant belonging to said regiment, from which it appears that the relator, together with other members of said regiment, after his return to it, was furloughed until the 15th of September last, at the expiration of which time he was ordered to report for duty at Tyler, Smith county, Texas, where the regiment was ordered to rendezvous; but up to the 25th of September, when affiant left camp, he had not joined the regiment or been heard of by him.

This motion is urged upon two distinct grounds; first, that the court has no jurisdiction on the application, if the relator has escaped from the custody to which he was remanded by the judgment from which he appeals. Secondly, if the court has jurisdiction, it will not act upon his application while he is at large. There is no doubt that in answer to the writ the respondent must produce the body of the person alleged to be illegally obtained, if in his custody, or under his control at the service of the writ, unless excused from so doing by the circumstances indicated in art. 149 Code Criminal Procedure; and that a return to the writ not accompanied by the body will be scanned with great caution.

(Hurd on Hab. Corp., 244.) And although this is to prevent evasions of the writ, and to secure the liberty of the citizen, yet if the party has been released from custody previous to the service of the writ, its object and purpose has been accomplished, and the court will take no order on the subject. (Commonwealth v. Chandler, 11 Mass., 83 ; U. S. v. Davis, 5 Cr. C. C. Rep., 652.) The only object of the writ is to relieve the party detained from the illegal restraint; if this is accomplished before the jurisdiction of the court attaches by the service of the writ, there is nothing upon which it can attach. It is not the object or intention of the writ to punish the respondent, or afford the party redress for his illegal detention. But the question occupies a different attitude after the jurisdiction of the court has been attached. It cannot then be defeated by the wrongful act of either of the parties. It is expressly provided by the Code of Criminal Procedure (art. 762) that upon the hearing of an appeal in cases of habeas corpus, the defendant (who undoubtedly must be understood to be the prisoner, or party detained,) need not be personally present.

The second ground of the motion, we think as a question of practice, is well taken, if the facts of this case called for its application; and were it not, also, that, from the character of the case, we think the public interest will be better subserved by hearing the appeal than by its continuance. The rule of the court not to hear appeals in criminal causes where the defendant has escaped, to which this case is claimed to be analogous, being merely a matter of practice, depending in its application to particular cases upon the discretion of the court; and, as the affidavit relied upon does not show conclusively that the relator has escaped from the custody to which he was committed, and may not, after but a temporary delay, have joined his regiment, the motion for a continuance will be overruled.

The questions arising upon the merits on this application, have been argued with great interest and zeal. Several of the points, however, made by the counsel for the relator, and most elaborately discussed, can have no influence in the decision of the case, as presented by the appeal, and doubtless had none in its determination

Ex Parte Coupland.

by the Chief Justice, though out of abundant caution, he permitted relator's counsel to save by bills of exception, every question suggested by them, as having any possible bearing upon the rights of their client.

As we have already said, a party's right to the writ does not depend upon the legality or illegality of his original caption, but upon the legality or illegality of his present detention. (Dew's case, 18 Penn., 37; Ren, v. Gordon, 1 Barn. & Ald., 572 n; Hurd. on Hab. Corp., 255, 256.) The relator was not, when the writ was served, detained by virtue of the order of the Provost Marshal, by whose order he seems first to have been arrested. We will not, therefore, consume time by a discussion of the questions that have been raised, as to the right or authority of a military officer, in time of war to declare martial law, or the effect of such declaration when made; or upon whom martial law when declared can operate; or the nature and character of such law. Nor will it be at all necessary that we should inquire into the regularity of the proceedings of the enrolling officers by whom relator was enrolled as a soldier, for, if he is subject to conscription, this court is not the appropriate tribunal for correcting the errors, if any, into which these officers may have fallen in discharge of their appropriate military duties; but his application for redress must be made to their superior officers, or other proper military authorities. (Art. 756, Code of Criminal Procedure.)

The only question in this case for our consideration, and upon which the determination of the case must turn, is, as to the legality of the relator's detention as a soldier in the army of the Confederate States, and this depends entirely upon the question, whether the "Act to further provide for the public defence," commonly known as the "Conscript Law," is constitutional. We address ourselves to the consideration of the question, with a full appreciation of its magnitude and importance, in respect both to public interest, and private rights; the liberty of the citizens, and the power of the government.

The objections that have been made to the constitutionality of the law, are frequently vague, and at times rather contradictory, but when analyzed resolve themselves into one or the other of the

following general objections. 1st. That it violates the liberty of the citizen. 2nd. That it is in derogation of the reserved rights of the States. Both objections, however, are to be considered in subordination to the general proposition, that it is incumbent upon those who maintain its constitutionality, as is the case with any other act of the Confederate Government, to show that the authority assumed by the Confederate States is sanctioned by an expressly delegated power; or, that the act itself is necessary and proper for the carrying into effect an expressly delegated power.

In determining, however, the constitutionality of a law passed by the Confederate Government, it is always important to consider whether the act in question, is done in the exercise of a power expressly granted, or under the implied powers granted by the 18th paragraph of the 8th section of the 1st article of the constitution; if it is the first, then the Confederate Government may use their discretion in the mode and manner of its exercise, unless it is limited or restrained in so doing by some other express provision, or clear and necessary implication, and the burden of showing this is upon those who assert the limitation. The authority given "to make all laws which shall be necessary and proper for carrying into execution" the expressly granted powers, was not intended merely to authorize congress to exercise by legislation the powers previously granted. And its right to do so depends in no manner upon this clause; but it is itself a direct grant of all such subsidiary and incidental powers as shall be "necessary and proper" to carry into effect the previously granted powers. And it is admitted that when authority to do an act is claimed under it, it is incumbent upon those who maintain it, to show, not merely that it is "*a necessary*" law, but that it is "*a necessary and proper*" one for carrying into effect the expressly granted power.

It can not for a moment be questioned, if there were no express grant of power to do so, that the right of the government of the Confederate States to raise and support armies could be sustained under the general granting clause of the constitution, to which we have referred. And we think it equally clear, that the law in question is in strict accordance with it, even when tested by the stringent rule of construction, that we have just recognized. The

power, however, to raise and support armies, is expressly granted by the constitution to the congress of the Confederate States. Is there then any limitation by other express provisions or necessary implication restraining it as to the manner of doing this? It has never been contended that there is any express provision to this effect. And if there is any such necessary implication, it must be, as we have said, by reason of the effect of the law upon the freedom and liberty of the citizen, or the political rights of the States.

Does this law violate any of the abstract or guaranteed rights of the citizen, or assume over him a control not delegated by the constitution? It has not, of course, been questioned that the power to raise an army may be exercised by congress. But it is said, it can only do this by voluntary enlistments, and that the citizens can only be compelled to do compulsory military duty as militia, under the 15th and 16th clauses of the same section of the constitution which gives to congress the power to raise armies.

It is said by Vattel, (p. 294,) that "the public authority raises soldiers, distributes them into different bodies under the command of generals and other officers, and keeps them on foot as long as it thinks necessary. And as every citizen or subject is bound to serve the State, the sovereign has the right to enlist whom he pleases. But he ought to choose such only as are fit for war; and it is highly proper that he should, as far as possible, confine his choice to volunteers, who enlist without compulsion. No person is naturally exempt from taking up arms in defence of the State—the obligation of every member of society is the same." It is insisted, however, that while it cannot be denied that this power exists under monarchical governments, it is not applicable to a republic. Its language imports its applicability alike to *citizens* or subjects. And this must be apparent when we consider that the abstract rights of every nationality over the inhabitants of which it is composed are the same, whatever may be its social compact or the constitutional functions through which it exercises its powers. And each individual can in a republic, with the same propriety as under a monarchy, be required to perform

military duty without his consent, if the demand is made by a proper exercise of the national will. Has then the nationality of Texas, (we speak of it as an independent sovereign community, or State,) conferred the power of doing this upon the Confederate States? Referring again to Vattel, (p. 293,) we find it said, " As war cannot be carried on without soldiers, it is evident that whoever has the right of making war, has also naturally that of raising troops. The latter, therefore, belongs likewise to the sovereign, and is one of the prerogatives of majesty." "Every citizen is bound to serve and defend the State as far as he is capable. Society cannot otherwise be maintained; and this concurrence for the common defence is one of the principal objects of every political association. Every man capable of carrying arms should take them up at the first *order of him who has the power of making war*." Again he says, (p. 14,) " The prince derives his authority from the nation; he possesses just so much of it as they have thought proper to entrust him with. If the nation has plainly and simply invested him with the sovereignty, without limitation or division, he is supposed to be invested with all the prerogatives, without which the sovereign command or authority could not be exerted in the manner most conducive to the public welfare. These are called royal prerogatives, or the prerogatives of majesty."

These extracts show, that the grant of the power to make war, carries with it by necessary implication, unless expressly withheld, the right to demand compulsory military services from the citizens. If this right is an incident of the prerogative of making war in a monarchy, where the people can exercise no control over the sovereign, how much more readily should we conclude that it was "a necessary and proper" implied power with us, when the war making power is given directly to the agents of the people, who can only be supposed to act under their directions, and to speak their sentiments, even if there had been no express grant of power given to congress to raise and support armies.

The power of the general government to do so has been long and frequently admitted in the United States, both by standard elementary authorities and judicial decisions. (Hurd on Hab. Corp., 8.) In the case of the United States v. Bainbridge, 1

Mass. R., 71, it is recognized as authorizing the practice established by the government, and sanctioned by numerous legislative enactments, of enlisting minors in the navy without the consent of their parents, and, also, in the army in the same manner, when the wants of the government required it. It was discussed and recognized while the constitution of the United States was before the people of the States for ratification; at which time we find Mr. Madison saying, in the Federalist, p. 187 : "Is the power of declaring war necessary? No man will answer the question in the negative. It would be superfluous, therefore, to enter into a proof of the affirmative. Is the power of raising armies and equipping fleets necessary? This is involved in the foregoing power. It is involved in the power of self-defence. But was it necessary to give an *indefinite power* of raising *troops*, as well as in providing fleets, and maintaining both in peace as well as in war?" " With what color of propriety could the force necessary for defence be limited by those who cannot limit the force of offence? If a federal constitution could chain the ambition, or set bounds to the exertions of other nations, then, indeed, might it prudently chain the discretion of its own government, and set bounds to the exertions for its own safety."

Upon the same general principle, also, rests the right to call out the militia, for this is also a compulsory service, and the grant of power to do this is no stronger than that to raise armies. But it is said that the power to call out the militia has been given, and as this is compulsory in its character, we are to presume that no other character of compulsory service was authorized, or intended to be granted. How the mere grant of one power, compulsory in its character, can limit or destroy another which had been previously given in equally express terms, we do not perceive. But, in connection with this objection, it is also insisted that the right to raise armies must be taken in subordination to the power conferred over the militia, as otherwise the rights of the State in this particular, would be destroyed. And hence, the power conferred upon the Confederate government to raise armies, it is said by those who urge the objection, must be construed as only authorizing, when an army is to be raised from the arms-bearing

citizens of the States—that this shall be done either by their voluntary enlistment, or by calling forth the militia.

To maintain this position with some degree of plausibility, its supporters are forced to assume that the militia, which the constitution says is necessary to the security of a free State, and which congress may provide for calling forth, subject to the right of the State to appoint the officers, is synonymous with the arms-bearing citizens of the State. And they, therefore, say, if an army is raised from these citizens, except by their voluntary enlistment, that in fact, whether it is so in name or not, the militia have been called forth, and the right of the State to appoint the officers to command them, cannot be disregarded.

The fallacy of the position seems to be manifest from the qualification which they are forced to give it. For, as we have shown, the citizen has no right to exercise volition, with regard to the performance of military duty, so as to impair, or qualify the power of congress to raise armies, and, if the qualification exists by reason of the rights of the State over the arms-bearing citizens as its militia, and to appoint their officers when in the service of the Confederate States, these rights could not surely be affected by the voluntary action of the citizen. Nor can the difficulty be gotten over by saying that it is further to be assumed that the State must be presumed to have consented to his voluntary enlistment; for it is as impotent as the citizen to destroy in this manner a constitutional right conferred upon congress, or thus to confer one not otherwise given. The question goes to the right of the State to appoint officers to command its arms-bearing citizens, when in the service of the Confederate States, because they are militiamen. But the individual is equally an arms-bearing citizen, whether he has gone into the service voluntarily, or otherwise. For surely the doctrine is not to be advanced that individuals, companies or regiments of the " well regulated" arms-bearing citizens, " necessary to the security of a free State," which has been organized, armed and disciplined as provided for by congress, and for whom a call is made by the Confederate States, in pursuance with the constitution, cease to be integral parts of the arms-bearing citizens of the State, because they pre-

fer to volunteer their services directly to the Confederate govern-
ment, and it is willing thus to accept them. Can they in this
manner evade or annul the constitutional right of the State, if it
is such, to appoint the officers to command its arms-bearing citizens
when in the service of the Confederate States? It is said, how-
ever, that unless this qualification is placed upon the power of
congress to raise armies, the control of the State over its militia
may be entirely destroyed; but would not the result be the same
if an equal number of its militia were to volunteer into the ser-
vice of the Confederate States? The truth of the matter is, that
when the citizen goes into the army raised by Congress, either
voluntarily or in obedience to the law requiring him to do so, he
does this as a citizen, and not as a militiaman. Congress has not
the right to raise armies in either mode, beyond the necessities of
the Confederate government, for carrying into effect its granted
powers. But in either case the citizen, when placed in its ser-
vice, is temporarily withdrawn from the control of the State as a
militiaman. For the time being, the right of the State, or, more
properly speaking, the right of the State government over him,
must yield to the more pressing and important demand for his
services by the Confederate government, to enable it to discharge
the duties for which it has been authorized to raise and support
armies.

The construction contended for would destroy one of the grants
of power conferred upon congress by the constitution, and would
reduce its authority merely to that of raising and supporting
armies, by calling forth the militia, instead of authorizing it, as it
does, to raise and support armies, and under certain circumstances
to call forth the militia. For, if you remit congress to the volun-
tary consent of the individual citizen to enable it to raise an army,
you have destroyed its power, and conferred upon it simply the
privilege of doing so. But the strong language of the con-
stitution is, that "congress shall have the power," &c. The
imperative duties imposed upon congress would alone have been
sufficient to authorize it to have exercised this power as the neces-
sary and proper means for their performance; and it would not
probably have been thought important to have conferred it by an

express grant, but that, from its absolute necessity for the dis-
charge of those duties, it was deemed essential to place it beyond
question that it had been conferred.

And this leads us to the inquiry, whether the construction con-
tended for will clothe the Confederate government with the ability
and resources necessary for the discharge of the duties imposed
upon it.   If congress has only the power of raising an army by a
call for the militia, it follows, as a necessary consequence, that it
can do so only for the purposes for which it is authorized to call
forth the militia by the constitution.   It cannot, therefore, raise
an army except to enforce the execution of the laws to suppress
insurrections or repel invasions.   It is consequently powerless to
protect the country from sudden assaults from without, or unex-
pected commotions from within.   It is impotent either to enforce
private rights, or maintain national honor against foreign powers.
But it is said that it is contrary to the spirit and genius of our
institutions that we should engage in foreign or aggressive war,
unless absolutely necessary; that it is against the theory of our
government that we should make war merely for conquest or do-
minion; and as congress has the privilege of raising armies by
voluntary enlistments, we may safely rely upon the patriotism
and martial spirit of the people to raise armies amply sufficient to
prosecute all necessary and proper foreign war; that the fact that
the government is forced thus to rely upon voluntary eslistments
for its soldiers to maintain foreign wars, operates, and was doubt-
less so intended, as a salutary check in restraining it from engaging
in them unnecessarily.   And as was said by counsel at the bar,
" where war is made, it is the people's war; and if they are not
willing to fight to carry it on, the government ought to stop it."
But if the individual citizen may determine for himself whether
he will aid the country in the field, why may he not also elect
whether he will withhold his quota of the revenue that is collected
to prosecute it?   It is not to be questioned, that the spirit of our
government, as is said, does not encourage wars for conquest or
dominion.   And for this reason, among others, the war making
power was conferred upon the representatives of the people.   It is,
therefore, unquestionably true, that war, when declared by their

representatives, is their war, and they can, at any time they desire to do so, withdraw from the government all means of prosecuting or maintaining it, or can limit and control it in the manner of its prosecution, or in the mode of raising armies to carry it on, as to them may seem fit.   It may be true, also, that the patriotism of our people may at all times be relied upon to furnish, by voluntary enlistments, sufficient forces to prosecute any war in which the nation should engage.   But still this does not go to the merits of the question, which is, whether the people, through their representatives, have not the power, if they see fit to exert it, of making the burthens of the war fall equally upon the willing and the unwilling.   It is not denied, however, that the Confederate States may be required to engage in a foreign war.   If this is so, it is the duty of its citizens to sustain it in its prosecution.   But why should the government be forced to rely upon the individual assent or voluntary aid of the citizens in this more than in the discharge of any other duty, or the exercise of any other power with which it is clothed ?   Why should not the citizen, if in this case he is left to individual volition, have the same privilege, if called upon as a militia man to aid in a defensive war?   If patriotism is a sufficient guaranty for the ability of the government in carrying on the war in one case, why is it not so in the other ?   Will the citizen be less ready to respond to the call of the government for the defence, *"pro aris et focis,"* than he would be when we are prosecuting a foreign war?   Certainly, the very reverse is the fact; and, therefore, when the militia are needed, the same stringent power over them is not given by the constitution as is given over them as citizens by the power to raise armies.   In the latter case, congress acts immediately upon them as individuals, while in the former it must reach them by a call upon the State executive ; and if this is disregarded, it has no power to enforce obedience.

The origin of this grant of power to raise armies shows most conclusively that it was not intended to leave the government dependent upon the will either of the citizen or the State to carry it into effect.   It is given in our constitution, as it was originally in the constitution of the United States, and was placed in that

for the purpose of correcting one of the leading defects in the articles of confederation, experience having proved it absolutely essential, not only to the safety, but to the very existence of the Confederacy. The following striking language was used at that time in reference to the want of this power in the articles of confederation, and the necessity of its grant to the general government in the then new union about being formed: "They may make war, and determine what number of troops are necessary; but cannot raise a single soldier." Again—"A government authorized to declare war, but relying on independent States for the means of prosecuting it, capable of contracting debts, and pledging the public faith for their payment, but depending on thirteen distinct sovereignties for the preservation of that faith, could only be rescued from ignominy and contempt by finding these sovereignties administered by men exempt from the passions incident to human nature." (1 Story's Const., 168–9.) And in the Federalist, (p. 98,) written, as it is well known, to secure the adoption of the constitution of the United States, we find the necessity for this grant of power boldly expressed, and the ruinous effects of attempting to rely upon calls upon the States for troops to prosecute a defensive war clearly and strikingly portrayed. "The power," says the writer, "of raising armies, by the obvious construction of the articles of the confederation, is merely a power of making requisitions upon the States for quotas of men. This practice in the course of the late war was found replete with obstructions to a vigorous and to an economical system of defence. It gave birth to a competition between the States, which created a kind of auction for men. In order to furnish the quotas required of them, they outbid each other, till bounties grew to an enormous and insupportable size. The hope of still further increase afforded an inducement to those who were disposed to serve to procrastinate their enlistment, and disinclined them from engaging for any considerable periods. Hence, slow and scanty levies of men, in the most critical emergencies of our affairs—short enlistments, at an unparalleled expense —continual fluctuations in the troops, ruinous to their discipline, and *subjecting the public safety frequently to the perilous crisis of a disbanded army*." How far like evils may have threatened

us, and induced a change of policy by the enactment of the present law, it is unnecessary to enquire.   Nor need we comment upon the unavoidable and disastrous effects that must have resulted from conflicts and jealousies among the officers of militia—the right to whose appointment is so zealously insisted upon.   If the State must appoint, it must also fill vacancies and give promotions, leading to inevitable and unending disputes about rank—that sacred and never to be infringed right of the officer—producing jarring and discordant elements in command, more disastrous in all military enterprise than even a want of discipline in troops.

But suppose the theory of those who oppose the constitutionality of this law is correct, and the new levies had been called into the field, not as troops of the Confederate States under the power to raise armies, but as militia, what might be the consequences ? The theatre of the war, if at present confined to our own territory, may, before its close, be necessarily shifted to that of the enemy. If the proper occasion should present itself for carrying the war into the enemy's country, shall our commanders be impotent to avail themselves of it, because of the character of the forces under their command ?   If they are militia they have no constitutional authority to march them beyond our own frontier, because the constitution has limited the right of the government to demand their services for the purpose of repelling invasion.   This doctrine was expressly recognized and maintained in congress, in 1812, by all the strict constructionists and State-rights politicians.   It may be said there would, under such circumstances, be no fear that the States would not sanction this use of its militia, and the patriotism of the citizen soldiers could be relied on with equal confidence, to sustain their country in this, as well as in every other emergency.   It was said by Mr. Cheves, than whom we could obtain no better authority, in response to this character of reasoning : " Though the gentleman from New York says the service of the militia is not to be bounded by geographical limits, I cannot discover the premises by which he comes to this conclusion, if the general government has no other power over the militia than is given to it in this clause of the constitution.   If they may cross the line, why not go to the walls of Quebec ?   The principle is

26

trampled upon the instant they pass beyond the territorial limits
of the United States; nor, if this be a correct construction, can
the consent of the individual add anything to the powers or rights
of the general government, while he remains a member of the
militia of the State." (4 vol. Elliot's Debates, 459.) And
however patriotic the soldiery may be, it takes but little knowledge
of armies or of men to teach us that war cannot be conducted un-
der a system by which the right of the general to command depends
from day to day upon the consent of his soldiers. But if this were
not the case, can we assent to such a limitation of a power of con-
gress by mere construction, as leaves the government impotent to
discharge its constitutional duties, unless the States, or their militia,
shall consent to the violation of the constitution. If so, it may
truly be said of the Confederate States, as it was of this old con-
federation, it may declare war, but it is impotent to prosecute it.

The theory of our government, when properly understood, does
not militate against the constitutionality of the law. On the con-
trary, it clearly tends to sustain it. The difficulty in the minds
of many seems to grow out of a failure to discriminate in the use
of the word "State." Whether it imports merely the local or
State government, or the political community, the nationality, the
people of the State in the aggregate, as a nation or political com-
munity, or as it is frequently expressed, the "Sovereign State,"
and in this way they come to think of the local (or, so to call it,
domestic,) government, as the government of the sovereign States,
having some undefined imaginary grant of powers, possessing
itself, as the representative of the sovereign State, some degree of
sovereignty. Especially so, with reference to the Confederate gov-
ernment, which they seem to think should be regarded as a creature
of its creation, and subordinate to it. And hence that its powers
should be construed in subordination to those of this *immediate
representative of the sovereign State.* In fact, however, nothing
is better established than that neither of these governments is in-
ferior or superior to the other. While both possess some of the
powers which are called by law writers, in distinguishing different
forms of government, "sovereign powers," neither of them are
themselves sovereign, but each of them represents the sovereign,

and both have within their mutual spheres of action just such powers and functions as have been conferred upon them by the constitution creating them.

When we enquire, then, what disposition the sovereign State has made of its right to military service from its citizens, between these two agencies, by which it proposes to administer its government, we find that it has given to its Confederate agency, so to call it, the sole power to determine upon the questions of war and peace, and that it has consequently made it the duty of that agent to protect the State itself, and its local agency from attacks from both domestic and foreign foes, and that it has clothed it with the power to do this, by authorizing it to raise and support armies, and to provide and maintain a navy, to the extent that in its judgment it should deem necessary. And lest it should not have provided amply for those purposes, or should be overtaken by a sudden emergency, it is further authorized to call upon the other agency to bring to its aid, if necessary, all of the arms-bearing population it had left still under the control of the local agent, for whose organization it was required to provide, that the local agency might be thus prepared to meet the call that these sudden emergencies might occasion. But as these calls would be rare, and the armies which the Confederate government would require to prosecute and carry on the war in which it would become involved, except under extraordinary circumstances, which would hardly happen more than once in the life time of a nation, would compose but a small part of the population of the State, and the local agency might, also, be called upon by sudden emergencies to defend itself and the State before a call could be made upon the other agent, and as that was intended, more especially, to represent the foreign, and this the domestic affairs of the State; the militia or citizens not required in the armies raised by the Confederate agency were left under the control of the local agency, with the right of appointing their officers, when it should be required to furnish them in these cases of emergency for the services of the Confederacy. These agencies, though possessing distinct powers, have to look for their performance to the citizens, and, consequently, as in many other grants of power to them, their action is concurrent over the same

Ex Parte Coupland.

subject matter, and at times may thus present seemingly conflict-ing grants of power. What then is to be their construction ? The answer is plain. The limited and subordinate must yield to the general and superior. Consequently, such as usually pertain to, or are indices of sovereign power must control, and be regarded as superior to those of a local and domestic character. Ordinarily there would be no appreciable conflict between these grants of power, as the number of citizens the Confederate government would require for its armies would be so inconsiderable with ref-erence to the bulk of militia, left under control of the local gov-ernment, as to be, for practicable purposes, unimportant to the latter. But great emergencies like that which now exist, will sometimes arise when the Confederate government is forced to ex-ercise the entire military power that has been granted it; and there is consequently a call of the great bulk of the arms-bearing citizens into its armies, and a corresponding diminution of those under the immediate control of the State government, under the laws governing the militia. The natural result of which is to arouse fearful apprehensions of coming danger in the over zealous advocates of State rights; or those who have been accustomed to look with apprehension upon any expansion of the military power of the general government. It must be borne in mind, however, that the denial of the power to raise such an army as the neces-sities of the government may require, is a denial of the right to raise a single man. While, if the power exist, it does so only to the extent of authorizing the Confederate government to raise and support such armies as are absolutely essential, to enable it to carry into effect the powers granted to it. And though a necessity exists to-day, and the law is, therefore, constitutional—if to-morrow that necessity should cease, its continuance would be as clearly unconstitutional.

It is also urged that this law introduces a novel practice in this country for raising armies. If, however, it is within congressional discretion, in the exercise of the power granted, this does not affect its constitutionality. And if the practice of conscription is novel with us, so are the circumstances which now surround the country. Engaged in a contest that involves our existence as a

Ex Parte Coupland.

nation, our liberties as a people, our lives, and the honor of our homes; all that we can desire in life or hope for in our posterity; with enemies who boast that they will soon have in the field an army far exceeding in numbers our entire arms-bearing population, who, baffled in an unholy lust of gain, and maddened by revenge, have buried, at home, the once cherished principles of republican liberty in a concentrated military despotism, that they might the better hope, if not to conquer, then to destroy us; who have shown themselves as treacherous and false in the cabinet as cruel and wanton in the camp; who have waged a war almost of extermination upon all classes and sexes of unoffending citizens who have fallen in their power, regarding neither the helplessness of infancy nor the feebleness of age, save as furnishing them a more certain victim; who, though accustomed to boast of their morality and virtue, with the self-righteousness of the Pharisee, have shown themselves as devoid of either, as they have been wanting in every ennobling principle of chivalrous and civilized warfare; who in two short campaigns have paralleled every atrocity of war for the last two hundred years. Engaged in such a war, if our government had failed to avail itself of every resource at its command for its most efficient prosecution, it would have shown itself derelict in duty, and unworthy of the high confidence with which the country has so generously trusted it.

Though this is the first occasion, in this country, that an army has been raised by conscription, it does not come before the country without the sanction of high authority. The principle upon which it is based was sanctioned and approved by General Washington in 1790; and it was maintained in 1812 by Mr. Monroe, then Secretary of War, in an argument of convincing clearness and cogency—(7 vol. Niles' Register, 137, 294; vol. 8, Id., 281)—and Mr. Troupe, and other distinguished strict constructionists of that day gave it their sanction.

The judgment is affirmed.

Bell, J. I concur in what is said in the opinion of the court respecting the motion which has been made by the Attorney-General for the continuance of this cause. I concur, also, in the

correctness of the proposition that the right of a party to a writ
of habeas corpus does not depend upon the legality or illegality of
his original caption and detention, but upon the legality or ille-
gality of the restraint at the time the writ is issued and the re-
turn made. I do not, therefore, feel at liberty to discuss the
legality of the original arrest of the appellant, or the right of
military commanders to place the citizens of these Confederate
States under martial law. As it appears, however, from the
record, that the Chief Justice, upon the original hearing, declared
that " his mind was made up as to the constitutionality of martial
law," from which expression I understand that he meant to ex-
press the opinion that martial law, as it existed in the county of
Travis at the time of the return of the writ in this case, might be
declared and enforced in conformity with the constitution of the
Confederate States.; that it may not be supposed that I entertain
a similar opinion, I take leave to say, that nothing, in my judg-
ment, could be a more palpable violation of the constitution and
of the rights of citizens. I believe that "the constitution," in the
language of Vice President Stephens, "was made for war as
well as for peace;" and that there exists no power, in any
department of the government of the Confederate States, to
transcend it or to suspend it upon any notion of public necessity.
I believe that no power exists anywhere in the Confederate Govern-
ment to subject citizens, not belonging to the army or navy, and
not actually serving in the militia, to any military code, or to the
will of any military officer, provost marshal or other, or to the
jurisdiction of any other tribunal than the ordinary courts of
justice established by law. I believe that under the constitution
of the Confederate States "no person can be held to answer for a
capital or otherwise infamous crime, unless on a presentment or
indictment of a grand jury, except in cases arising in the land or
naval forces, or in the militia when in actual service in time of
war or public danger;" and that " in all criminal prosecutions the
accused has the right to a speedy and public trial by an impartial
jury of the State and district wherein the crime shall have been
committed." I know that some have supposed that congress has
the power to declare martial law, as an incident of the power to

make war. It is true that congress has the war power; but that power and all its other powers must be exercised in subordination to those provisions of the constitution which I have just quoted. But I said that I do not feel at liberty to discuss this subject. I therefore take leave of it, having said thus much only from a desire that my humble testimony, worthless as it may be, shall ever be in support of the laws, and of the rights of the people, rather than in support of arbitrary power, which is destructive alike of public liberty and private right.

I am not able to concur in the judgment which has been rendered in this case, nor in the reasoning of the majority of the court in support of the constitutionality of the acts of the congress of the Confederate States, commonly called the conscript laws. I believe those acts to be unconstitutional. The question is one of the greatest magnitude; it is directly presented for decision; and believing it to be fraught with the most vital concern to the principles of civil liberty and free government, I cannot forbear to express my opinion.

It is said in support of the constitutionality of these acts of conscription, that the war making power is committed to congress by the constitution, and that it is also declared by the constitution that congress shall have power "to raise and support armies." And it is contended that this power to raise and support armies is without any limitation, and that congress may exercise an unlimited discretion in the choice of the means by which to carry it into effect. In the opinion of the court, the arguments employed by the authors of the Federalist, when the constitution of the United States was before the people for their consideration, to show that it was necessary to confide to the general government about to be instituted the power to raise and support armies, are quoted. The arguments employed by the same writers to show that there ought to be no limitation upon the power of the general government to raise and support armies, are also quoted. Vattel is quoted as authority for the proposition that "no person is naturally exempt from taking up arms in defence of the State;" and that "every man capable of bearing arms should take them up at the first order of him who has the power of

making war," that is, at the first order of the sovereign. It is further argued, in the opinion, that if the power of the government to compel citizens to enter the military service be denied, this is equivalent to the denial of the power to raise armies; that if the government can only raise armies by the voluntary enlistment of citizens, the power is wanting, and only a privilege remains. It is also assumed that for the general government to compel all citizens between the ages of eighteen and forty-five years to enlist in the regular army, under officers appointed by the President, is no interference with the constitutional rights of the States over their militia, because it is said the general government takes the individual in his capacity of citizen, and not in his capacity of militia man.

I shall notice these positions and arguments only so far as may be necessary to the presentation of my own views.

In any inquiry into the form, the spirit and the powers of government, and in the examination of questions which are in themselves fundamental, while the proper weight is to be given to former usage, to cotemporaneous expositions, and to the opinions of eminent men, the impartial and philosophic inquirer after truth will not fail to note carefully all the circumstances under which any particular usage obtained, the sources from which cotemporaneous expositions emanated, and the general character, the cast of mind, the political predilections, the party connections and the like, of any eminent or distinguished person whose opinion may happen to be in question.

In any question concerning the constitution of the United States, (and equally in any question concerning our own constitution, so far as it is a copy of that celebrated original,) the writings of Hamilton, Madison and Jay, known as "The Federalist," are entitled to very high consideration, as a cotemporaneous exposition of the powers intended to be conferred by the constitution upon the government which it proposed to establish. It is known to all persons who are possessed of even a slight knowledge of the political history of the United States, that Mr. Hamilton was the great exponent of the opinions of the federal party of that day, and that he was in favor of a much stronger government than that

established by the constitution of 1787.   It is also known that Mr. Jay, the first Chief Justice of the United States, was also a member of the federal party, and entertained, in the main, the same views as Mr. Hamilton, on the subject of government.   But it is not so generally known that Mr. Madison, who soon after the adoption of the constitution joined the republican party, and became the ablest supporter of Mr. Jefferson in his great struggle with the elder Adams, was, until the adjournment of the convention which framed the constitution, as much in favor of a strong government as Mr. Hamilton himself, or nearly so.   Such, however, was the fact, and all his propositions and speeches in the federal convention bear testimony to the fact.

In his discourse on the constitution and government of the United States, Mr. Calhoun commenting upon the opinions of the authors of the Federalist, and arguing to show that they had fallen into a radical and dangerous error concerning the very form of the government, as federal or national, uses the following language : "How the distinguished and patriotic authors of this celebrated work fell—against their own clear and explicit admission—into an error so radical and dangerous, one which has contributed more than all others combined, to cast a mist over our system of government, and to confound and lead astray the minds of the community as to the true conception of its real character, cannot be accounted for, without adverting to their history and opinions as connected with the formation of the constitution.   The two principal writers (meaning Mr. Hamilton and Mr. Madison) were prominent members of the convention, and leaders of that body of the party which supported the plan for a national government. The other, (meaning Mr. Jay) although not a member, is known to have belonged to the same party.   They all acquiesced in the decision which overruled their favorite plan, and determined, patriotically, to give that adopted by the convention a fair trial, without, however, surrendering their preferences for their own scheme for a national government.

It was in this state of mind—which could not fail to exercise a strong influence over their judgments—that they wrote the Federalist; and on all questions connected with the

character of the government, due allowance should be made for the force of the bias under which their opinions were formed." This language is used, I think, in the spirit of just and enlightened criticism, differing somewhat from the spirit of the senate and house of representatives of South Carolina, as exhibited in their "protest against the system of protecting duties," in which they thought proper to offer an apology for citing the Federalist as an authority upon a political question. If, then, it can be shown that the writers of the Federalist have not only not claimed for the government of the United States an unlimited power over the citizens for the purposes of war, but have constantly based their arguments concerning the war power of the government upon assumptions wholly at variance with any idea of unlimited control over the citizens, this would seem to go a great way toward establishing the proposition that the government has no such unlimited control. The authors of the Federalist painted in strong colors the imbecility of the States under the articles of confederation, and showed that congress, under that system, lacked the powers essential to efficient and stable government. It devolved upon them to answer, or they rather assumed the task of answering the arguments which were rife throughout the country against standing armies in time of peace. They asserted the evident proposition that if the government about to be established was charged with the common defence of the States, it should be entrusted with the means essential to such defence. It was said that the danger to which the States might at some future time be exposed could not be estimated or foreseen, and therefore the government charged with the duty of defending against such danger, should not be limited in its power to defend. Nothing but the utmost jealousy of their liberties could have made it necessary to urge upon the people propositions so plain and fundamental.

In the 41st number of the Federalist, written by Mr. Madison, taking a general view of the powers proposed to be vested in the Union, he proceeded to reduce them into classes, as they related to different objects. The first object to which he called attention was, "security against foreign danger." He classified the powers necessary to security against foreign danger, thus: " Those of

Ex Parte Coupland.

declaring war, and granting letters of marque; of providing armies and fleets; of regulating and calling forth the militia; of levying and borrowing money." Here, it will be seen, the power of the government over the militia is treated as a part of the war power. In number 29, it is said by Mr. Hamilton, "The power of regulating the militia, and of commanding its services in times of insurrection and invasion, are natural incidents to the duty of superintending the common defence, and of watching over the internal peace of the Confederacy." Here again the militia is treated as a part of the means to be used by the government in the exercise of the war power. Again, Mr. Hamilton says, "If standing armies are dangerous to liberty, an efficacious power over the militia, in the same body, (that is, in Congress,) ought, as far as possible, to take away the inducement and the pretext, to such unfriendly institutions." In the 45th and 46th numbers, Mr. Madison entered upon a full discussion of the supposed danger to the State governments from the powers of the Union, and of the ability of the State governments to sustain themselves against encroachments upon their reserved powers, by the government of the Union. In one place he says: "The number of individuals employed under the constitution of the United States, will be much smaller than the number employed under the particular States. There will consequently be less of personal influence on the side of the former than of the latter. The members of the legislative, executive and judiciary departments of thirteen and more States; the justices of the peace, officers of the militia, ministerial officers of justice, with all the county, corporation, and town officers for three millions and more of people, intermixed, and having particular acquaintance with every class and circle of the people, must exceed beyond all proportion, both in number and influence those of every description who will be employed in the administration of the federal system. Compare the members of the three great departments of the thirteen States, with the members of the corresponding departments of the single government of the union; compare the militia officers of three millions of people with the military and marine officers of any establishment which is within the compass of probability, or, I may add, of possibility, and in

this view alone we may pronounce the advantage of the States to be decisive." In summing up the argument upon this subject, Mr. Madison said; "The only refuge left for those who prophecy the downfall of the State governments, is the visionary supposition that the federal government may previously accumulate a military force for the projects of ambition. The reasonings contained in these papers must have been employed to little purpose, indeed, if it could be necessary now to disprove the reality of this danger, that the people and the States should, for a sufficient period of time, elect an uninterrupted succession of men ready to betray both ; that the traitors should, throughout this period, uniformly and systematically pursue some fixed plan for the extension of the military establishment; that the governments and the people of the States should silently and patiently behold the gathering storm, and continue to supply the materials, until it should be prepared to burst on their own heads, must appear to every one more like the incoherent dreams of a delirious jealousy, or the misjudged exaggerations of a counterfeit zeal, than like the sober apprehensions of genuine patriotism. Extravagant as the supposition is, let it, however, be made; let a regular army fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government ; still it would not be going too far to say, that the State governments, with the people on their side, would be able. to repel the danger. The highest number to which, according to the best computation, a standing army can be carried in any country, does not exceed one hundredth part of the whole number of souls ; or one twenty-fifth part of the number able to bear arms. This proportion would not yield, in the United States, an army of more than twenty-five or thirty thousand men. To these would be opposed a militia amounting to near half a million of citizens with arms in their hands, officered by men chosen from among themselves, fighting for their common liberties, and united and conducted by governments possessing their affections and confidence. It may well be doubted whether a militia thus circumstanced, could ever be conquered by such a proportion of regular troops. Those who are best acquainted with the late successful resistance of this country against

Ex Parte Coupland.

the British arms, will be most inclined to deny the possibility of it. Besides the advantage of being armed, which the Americans possess over the people of almost every other nation, the existence of subordinate governments, to which the people are attached and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than a simple government of any form can admit of. Notwithstanding the military establishments of the several kingdoms of Europe, which are carried as far as the public resources will bear, the governments are afraid to trust the people with arms. And it is not certain, that with this aid alone, they would not be able to shake off their yokes. But were the people to possess the additional advantages of local governments chosen by themselves, who could collect the national will and direct the national force, and of officers appointed out of the militia by these governments, and attached both to them and to the militia, it may be affirmed with the greatest assurance, that the throne of every tyranny in Europe would be speedily overturned in spite of the legions which surround it." Thus wrote Mr. Madison. Even the injustice of party never denied either to Mr. Madison or Mr. Hamilton great talents, ardent patriotism, honesty of purpose, and purity of personal character. Can it be possible, I ask, that such men could present the arguments and the views which I have quoted, to their fellow citizens, to induce them to adopt a form of government which committed to the legislative department the power, by a single vote, to compel every man, between the ages of eighteen and forty-five years, to become a regular soldier, subject to the orders of the President? It is not possible; and we are, therefore, driven to the conclusion that when those illustrious men contended that the general government, which was charged by the constitution with the common defence, should be clothed with "the indefinite power of raising troops;" and when they said, in general terms, that the power of congress "to raise and support armies," should be without any limitation, they only meant to say that congress ought not to be controlled by any limitation in the constitution as to the number of troops they might raise; and that they ought not to be limited as to the time when they might raise armies, but that they should have the

power to raise armies, and to support them in time of peace as well as after a declaration of war. In the last quotation which I have made from the 46th number of the Federalist, by Mr. Madison, he assumes that an extensive military establishment could only be created by the uniform and systematic pursuit of some fixed plan for that purpose and when he proposes to concede, for the sake of the argument, all that the government could do by way of accumulating a military force for the projects of ambition, he limits its possible efforts to the accumulation of a force of twenty-five or thirty thousand men, having reference to the population of that day; which force, he concludes, could not cope successfully with the militia of the States. Can it be possible that a statesman like Mr. Madison would have ventured upon such a position and such an argument, if it could have been replied to him that the congress could vote a hundred thousand men into the ranks of the regular army whenever they pleased, and compel them to serve or be treated as deserters; and that the militiamen of the states could be compelled, in their character of citizens, to serve in the army as regular soldiers? I say again, it is not possible.

I have no controversy with the quotations which are made, in the opinion of the court, from Vattel. The principles announced in the passages quoted are sound. But they have application only where written constitutions have not imposed limitations upon sovereign power at variance with them, or in restraint of them. Vattel wrote his justly celebrated work on the law of nations, and was sleeping in his grave some years before the declaration of American Independence. It has been our boast that our revolutionary ancestors made some advance in the principles and science of government, and kindled again the vestal fire on the altar of liberty, which had been smouldering under the ashes of two thousand years. I am not prepared, therefore, to accept Monsieur Vattel as a valuable authority upon a question concerning the power of the government of the United States, or of the Confederate States.

I shall now proceed to inquire somewhat more particularly whether the power which is granted to the congress of the Confederate States to raise and support armies is without any limitation,

and whether or not congress is left to the exercise of an unlimited discretion as to the means by which it may be carried into effect. In the opinion of the court, it is said that, "in determining the constitutionality of a law passed by the Confederate government, it is always important to consider whether the act in question is done in the exercise of a power expressly granted, or under the implied powers granted by the 18th paragraph of the 8th section of the 1st article of the constitution. If it is the first, then the confederate government may use their discretion in the mode and manner of its exercise, unless it is limited or restrained in so doing by some other express provision or clear and necessary implication, and the burthen of showing this is upon those who assert the limitation." The court further say, that "the authority given to make all laws which shall be necessary and proper for carrying into execution the expressly granted powers, was not intended merely to authorize congress to exercise by legislation the previously granted powers. And its right to do so depends in no manner upon this clause, but it is itself a direct grant of all such subsidiary and incidental powers as shall be necessary and proper to carry into effect the previously granted powers. And it is admitted, that where authority to do an act is claimed under it, it is incumbent upon those who maintain it to show, not merely that it is a 'necessary' law, but that it is a necessary and proper one for carrying into effect the expressly granted power." The 18th paragraph of the 8th section of the 1st article of the constitution of the Confederate States is in these words: "Congress shall have power to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the Confederate States, or in any department or officer thereof." The language is precisely the same as that of the last clause of the 8th section of the 1st article of the constitution of the United States, with the exception, of course, of the style of the government. This clause of the constitution of the United States has been much discussed. In Mr. Madison's report on the Virginia resolutions of 1798, it is said in reference to this clause, "The plain import of this clause is, that congress shall have all the incidental or instru-

mental powers necessary and proper for carrying into execution all the express powers, whether they be vested in the government of the United States, more collectively, or in the several departments or officers thereof. It is not a grant of new powers to congress, but merely a declaration for the removal of all uncertainty, that the means of carrying into execution those otherwise granted are included in the grant. Whenever, therefore, a question arises concerning the constitutionality of a particular power, the first question is, whether the power be expressed in the constitution. If it be, the question is decided. If it be not expressed, the next inquiry must be, whether it is properly an incident to an express power, and necessary to its execution. If it be, it may be exercised by congress. If it be not, congress cannot exercise it." Judge Story has incorporated this language into his Commentaries on the Constitution, with very slight alteration. He says the clause in question "neither enlarges any power specifically granted, nor is it a grant of any new power to congress." Mr. Monroe, in the celebrated paper containing his views on the subject of internal improvements, which accompanied his message vetoing the "Act for the preservation and repair of the Cumberland road," (May 4th, 1822,) speaking of this clause of the constitution, said : " I have always considered this power as granted on a principle of greater caution, to secure the complete execution of all the powers which had been vested in the general government. It contains no distinct and specific power, as every other grant does, such as to lay and collect taxes, &c. My impression has been invariably, that this power would have existed substantially, if this grant had not been made." Mr. Calhoun, in his discourse on the constitution and government of the United States, speaking of this clause, says : "This power," (meaning the power to pass laws to carry into effect the powers expressly granted,) "this power, comprehensive as it is, is, nevertheless, subject to two important restrictions ; one is, that the law must be necessary ; and the other, that it must be proper. To understand the import of the former, (that is, that the law must be necessary,) it must be borne in mind that no power can execute itself. They all require means, and the agency of the government to apply them. The

Ex Parte Coupland.

means themselves may, indeed, be regarded as auxiliary powers. Of these, some are so intimately connected with the principal power, that, without the aid of one, or all of them, it could not be carried into execution; and of course, without them, the power itself would be nugatory. Hence, they are called implied powers; and it is to this description of incidental or auxiliary powers that congress is restricted in passing laws necessary to carry into execution the powers expressly delegated." But, Mr. Calhoun continues, "the law must also be proper as well as necessary in order to bring it within its competency. To understand the true import of the term in this connection, it is necessary to bear in mind that even the implied powers themselves are subject to important conditions, when used as means to carry powers or rights into execution. Among these, the most prominent and important is, that they must be so carried into execution as not to injure others; and as connected with, and subordinate to this, that where the implied powers or means used come in conflict with the implied powers or means used by another, in the execution of the powers or rights vested in it, the less important should yield to the more important, the convenient to the useful, and both to health and safety; because it is proper they should do so."

In the celebrated case of McCulloch v. The State of Maryland, (4th Wheaton,) Chief Justice Marshall, in treating of the clause in question, says: " We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and *spirit* of the constitution, are constitutional."

In the light of these expositions I think it safe to say, that there can be no shifting of the burthen of argument upon questions involving the powers of the government, upon the ground of any

27

distinction between express and implied powers. The government is one of limited powers, and whoever asserts the constitutionality of a particular power, must show it. Is the power expressed in the constitution? If it is, the question is decided. If it is not expressed, then it must be shown to be necessary to the execution of some power that is expressed, and not only necessary, but proper to be used in carrying into execution some power that is expressed. The majority of the court say, the power to raise and support armies is expressly granted. This, of course, is not denied; but I beg leave to say, it is not to the purpose. The question is not, whether or not the power to raise and support armies is expressly granted; the question is, whether or not the power to raise armies *by conscription* is expressly granted. It will, of course, be conceded, that the constitution contains no such express grant of power. Then the further questions arise, is conscription one of the implied powers? is it a means necessary to be used in carrying into effect the power to raise armies? is it a means proper to be used? does it consist with the spirit of the constitution? is it not a means, the use of which will conflict with the reserved right of the States to train their militia, and to appoint the officers of the militia?

In considering whether a law is necessary, in the sense of the constitution, to carry into effect an express power, if we are not to adopt the strict rule laid down by Mr. Calhoun, to wit, that the express power would be nugatory without use of the means proposed by the law, I take it for granted that we will not, on the other hand, go back to that latitude of construction, and to the reasoning by which the federalists of 1798 claimed for the congress of the United States the power to exercise a censorship over the press, as a means necessary and proper to carry into effect the power to suppress insurrections. We have been accustomed to read, with the interest that attaches to the drama, the history of the great struggle which elevated Mr. Jefferson to the presidency. It is the first conspicuous landmark in the history of the government of the United States under the constitution. It has always been claimed that the republican party performed a patriotic service in resisting the tendency to a rapid consolidation

of powers in the general government, and that their illustrious leader was the faithful sentinel who saw the danger to the constitution, and met it with a noble devotion to the cause of liberty. And in the subsequent history of the government; in Mr. Monroe's denial of the power of the government to establish a system of internal improvements without limitation; in General Jackson's memorable struggle with the bank of the United States; and in every step which has been made towards a strict construction of the constitution, the people have hailed the triumph of sound principles and felt renewed confidence in the stability of republican institutions. I cannot, therefore, accept that as a sound construction of the constitution which involves an immeasurable departure from those principles which conducted the people of the United States to unexampled prosperity and greatness, and to preserve which was the avowed purpose of these Confederate States in the dissolution of the old union, and the establishment of our present government.

It cannot be contended that conscription is a means necessary to carry into effect the power to raise armies. Such a proposition, besides being contrary to reason, would find its contradiction in the facts of history, and in the events which are transpiring before our eyes. The government of the United States has always kept an army on foot, maintained an honorable contest with Great Britain in 1812, and planted her banners on the walls of the capital of Mexico in 1847, but has never raised troops by conscription. We have seen gallant armies take the field at the call of these Confederate States, without any conscription. We are told that the government of the United States is prepared to precipitate upon us not much less than a million of men. They have been raised without any conscription. Conscription cannot, therefore, be a necessary means of raising armies. And it would seem that the facts above mentioned ought to furnish a sufficient answer to the position which is assumed, that if the government cannot compel the citizens to enter the regular army, then the power to raise an army is wanting, and the government has only the privilege of raising armies. It would seem that a privilege which

enables a government to bring a million of men into the field can only be a misnomer for the power to do so. The word "privilege" properly signifies an exemption from some duty, an immunity from some general burthen or obligation, a right peculiar to some individual or body. The word could not with propriety be substituted for the word power in the constitution. But let us suppose it had been used instead of the word power. After the criticism which would have been elicited because of the use of an improper word, what meaning would necessarily have been drawn from its use? "Congress shall have the privilege of laying and and collecting taxes, duties, imposts and excises;" "Congress shall have the privilege of borrowing money on the credit of the Confederate States." Would it not have been said that the framers of the constitution meant to say that congress should have the power to do these things? The word power is the appropriate word, but it is not used in the sense of force. We speak with correctness of the military power of a government. We say, for example, the government of the United States has not the power to conquer the people of the Confederate States; meaning that it cannot use the necessary force. But when we speak of the legislative, the executive, the judicial power of a government, there is no idea of force connected with the word. It is true that the executive department of the government may sometimes use force in carrying into execution the will of the legislative department. The executive department may use force in suppressing insurrections, and must necessarily use it in repelling invasions. But when it is said that congress shall have power to constitute tribunals inferior to the Supreme Court, to establish uniform laws of naturalization, and uniform laws on the subject of bankruptcies, to coin money, to borrow money, and the like, there is no idea of force connected with the use of the word power. It cannot be denied that congress may raise armies by accepting the services of those who may voluntarily enlist. It has then the power to do this; but it cannot be said that congress can use force, or require the executive department to use force to compel a citizen voluntarily to enlist, because this would be sheer nonsense. The use of

the word, then, by no means carries with it the implication that congress may employ force to do everything which it is said to have the power to do.

For the purpose of testing this question of the power of the government to compel citizens to enter the regular army, let us examine the scope of another of the express powers, and one of a kindred nature to that of raising armies. The constitution says " congress shall have power" "to provide and maintain a navy." The grant of power, so far as the language employed in making the grant is concerned, is without any limitation. The grant of power to raise and support armies is limited by the provision that "no appropriation of money to that use shall be for a longer term than two years." The power "to provide and maintain a navy" is without any such limitation. I now recur once more to the language of the Federalist, which is quoted in the opinion of the court. "Is the power of raising armies and equipping fleets necessary? This is involved in the foregoing power (meaning the power to declare war). It is involved in the power of self defence. But was it necessary to give an indefinite power of raising troops, as well as of equipping fleets, and maintaining both, in peace as well as in war?" Mr. Madison insists that these powers were necessary. Now I ask the question, has the congress of the Confederate States the power, under the constitution, to compel the citizens of these States, between the ages of eighteen and forty-five years, to enter the naval service, to become seamen or marines, for an indefinite period of time, or for five or ten years? Who will answer the question in the affirmative? Yet the power " to provide and maintain a navy" is to the full extent as broad and unlimited as the power to raise and support armies; and the indefinite power of equipping fleets is put, by the author of the 41st number of the Federalist, on precisely the same footing as the indefinite power of raising troops. If the British practice of impressing seamen is authorized by the constitution of the Confederate States or of the United States, I venture the assertion that the people of both countries are ignorant of the fact. And if it is admitted that the congress of the Confederate States has not the power to compel citizens to enter the naval service, I

should be glad to be furnished with a reason why it has not, by those who claim that it has the power to compel citizens to enter into the regular army. Take the two grants of power, and how can you draw a distinction between them? Congress shall have power "to raise and support armies." Congress shall have power "to provide and maintain a navy." It is well known that in France the conscription furnishes seamen and marines as well as soldiers for the regular army. If our government possesses an unlimited control over the citizens for purposes of defence, then it has the power to assign them to the land or naval service, at its pleasure. I make bold to say that the government of the Confederate States possesses no power to compel citizens to enter into its naval service; and for the simple reason that the government is one of limited powers, that the people who instituted it were a free people, and had the right to make such a government as they pleased to make, and that they never intended to invest the government with an unlimited control over their persons for the purposes of war. And for the same reasons the government has no power to compel the citizens of the States to enter the regular army. The truth is, there are limitations upon the powers of the governments of the United States and of the Confederate States, besides those which are expressed in the constitutions of each. And this is what is meant by the spirit of the government. It would have been impossible, in the formation of a constitution of government by the free people of several independent States, having for its principal object the regulation and control of their foreign relations and interests, to have specified the powers and rights which they intended to reserve to themselves. All that could be done was, for the sake of caution, to declare that they reserved to themselves the powers which were not delegated by the constitution to the general government When, therefore, we come to inquire what the reserved powers are, or, in other words, what are the limitations upon the delegated powers, we are entering a wide field of investigation, and one that invites to the noblest exercise of mind. In determining such questions respect must be paid to all the circumstances under which the constitution was established, to the purposes for which it was established, to

the condition, and to the intentions of the parties who established it. And it is never to be inferred that a delegated power is absolutely without any limitation, because no limitation is expressed in the constitution, nor yet because there is no clear implication of a limitation from anything that is expressed. Mr. Calhoun says, "there is indeed no power of the government without restriction; not even that which is called the discretionary power of congress." The constitution says that "the president shall have power, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the Senators present concur." And in another place it is said that the "constitution and the laws of the Confederate States made in pursuance thereof, and all treaties made, or which shall be made under the authority of the Confederate States, shall be the supreme law of the land."

It will be seen that the power to make treaties is without any express limitation. Yet there must be important limitations upon the treaty making power. It must be considered with reference to the general purposes for which the government was instituted. Some of the limitations upon the treaty making power will be found to arise by necessary implication from other provisions of the constitution. For instance, the president and senate could not enter into a treaty with England to make war against France, because the power to make war is committed to congress, and one provision of the constitution cannot be construed to the destruction of another. Nor would it be competent for the president and senate to make a treaty ceding that portion of the territory of Texas which lies west of the Nueces river to Mexico, without the consent of the people of Texas—not because there is any prohibition of such a treaty expressed in the constitution, nor yet because such a prohibition can be clearly implied from anything that is expressed, but because such a treaty would not be in pursuance of the purposes for which the government was instituted, and because the people of Texas never intended to clothe the government with any such power.

Other examples might be given, were it necessary, of limitations upon the powers of the government, which are not expressed in the constitution, but which spring, necessarily, from the reserved

rights of the people.  The substance of the whole is, that the
powers of the government must be so construed as to trench as
little as possible upon the liberty of the citizen; and so as to inter-
fere in the least possible degree with the domestic concerns of the
people, the regulation of which is reserved to the States respect-
ively.  It may be argued, and it may be true, that to deny to the
general government the right to compel citizens to enlist in the
regular army, and to confine its power to make war to the employ-
ment of the militia, and of such regular forces as may be raised
by the voluntary enlistment of the people, will leave the govern-
ment less able to wage war with vigor, than it would be if possessed
of the power contended for by the advocates of conscription.  The
plain answer to all such arguments and complaints is, that the
government was not instituted with a view to the greatest possible
efficiency in war.  It was not the purpose of the people in its
establishment, to foster a military spirit, or to tempt their rulers
to undertake those enterprises so attractive to vulgar ambition, by
furnishing the means · for their easy accomplishment.  They de-
clared their purpose to be, to establish justice, to insure domestic
tranquillity, and to secure the blessings of liberty to themselves
and their posterity.  I am of opinion that they never intended to
arm a government instituted for such purposes with the tremendous
military power which is claimed by the acts of conscription.  I do not
believe those acts to be necessary to carry into effect the war power·
with which the government has been clothed.  I do not believe
them to be proper, because not necessary, and not consistent with
the spirit of the constitution.  More than this, if more be needed
to condemn them, I believe them to be directly in conflict with the·
reserved rights of the States over the militia; or, what is perhaps,
the same thing substantially, the reserved rights of the people to
do military service as militia, when military service is required of
them.

Before proceeding, however, to the examination of the provisions
of the constitution respecting the militia, I will briefly notice, as
matter of historical interest, and, also, as bearing somewhat upon
the question under discussion, the fact, which is alluded to in the·
opinion of the court, that the power to compel citizens to do mili-.

tary service in the regular army, was claimed for the government of the United States by Gen. Knox, during Gen. Washington's administration, and by Mr. Monroe, during Mr. Madison's administration. Gen. Knox was Secretary of War, and a soldier by profession. The plan which he proposed had the approbation of Gen. Washington, and would have been little burdensome in its practical operation.

There had, but a short time before, been an insurrection in Massachusetts, and the relations of the government with France were far from satisfactory, but the plan was rejected, and in lieu of it the militia law of 1792, which, with slight alterations, has continued in force ever since, was enacted. In 1814 Mr. Monroe was Secretary of War, and also Secretary of State. The war with Great Britain was assuming the most serious aspect. The temporary cessation of hostilities in Europe, consequent upon the first expulsion of Napoleon, left England at liberty to employ an immense force against the United States. England threatened a war of destruction. Mr. Monroe recommended to congress a plan for the increase of the army, in which he asserted the right of the government to compel the citizens to do military service in the regular army. His plan was substantially as follows: That the free male population of the United States, between the ages of eighteen and forty-five years should be formed into classes of one hundred men each, and that each class should furnish four men for the war, and replace them in the event of casualty; that the classification should be formed with a view to the equal distribution of property among the classes; that if any class failed to furnish the men required of them within the time specified, they should be raised by draft on the whole class; and that any person thus drafted should be allowed to furnish a substitute: that the bounty in land which the government was offering should be allowed each recruit, and the bounty in money, which the government was paying, should be paid to each draft or recruit by the class to which he belonged, according to the value of the property which the persons composing the class respectively possessed. Mr. Monroe proposed to carry this plan into effect, by committing the execution of it to the County Courts throughout the United States,

or by relying on the militia officers in each county, or by appointing particular persons in each county for the purpose. This plan was denounced as a French conscription, and was rejected. While it was under consideration, John Randolph, of Roanoke, addressed a public letter to a distinguished citizen of Massachusetts, in relation to the position of hostility to the war, which that State had assumed. In eloquent terms and in the most patriotic spirit, he urged upon the people of Massachusetts, fidelity to the Union, and a proper support of the government. In the conclusion of the letter, after speaking of the great increase of the army, he says, "If, under such circumstances, you ask me what you are to do, should a conscription of the model of Bonaparte be attempted, I will refer you to its reputed projector, Col. Monroe. Ask him what he would have done whilst Governor of Virginia and preparing to resist federal usurpation, had such an attempt been made by Mr. Adams and his ministers, especially in 1800. He can give the answer." Mr. Monroe was governor of Virginia A. D. 1800, and it is known that the State, in the language of Mr. Randolph, "was preparing to resist federal usurpation." I can only understand Mr. Randolph as meaning to say, that he would expect the State of Massachusetts to resist, if a conscription was attempted. Mr. Monroe was a man of known patriotism, of great elevation of character, of revolutionary services. He had borne himself as a gallant soldier on many fields—Harlem Heights and White Plains, Brandywine, Germantown and Monmouth. He had led the vanguard, with conspicuous gallantry, at Trenton, and had received there a grievous wound. But we are told that his proposal of a conscription, as it was called, was believed by himself to have damaged his popularity to such a degree that he determined not to become a candidate for the presidency, as successor to Mr. Madison, and only abandoned his resolution because of a speedy close of the war, and the return of the people to a better temper. When it is remembered that at the time Mr. Monroe proposed his plan for an increase of the army, the government of the United States was paying to every soldier who enlisted, the enormous bounty of one hundred and twenty-four dollars, besides a liberal bounty in land, I think the principle of conscription, in the mild

Ex Parte Coupland.

form in which it was proposed, ought to be regarded as a somewhat weighty expression of the sense of the nation, or to say the least, that no argument or inference in favor of the constitutionality of the principle, can be drawn from all the facts.

I now proceed to notice very briefly the constitutional provisions on the subject of the militia.   It is said in the constitution, "Congress shall have the power to provide for calling forth the militia to execute the laws of the Confederate States, suppress insurrections and repel invasions."   Again, it is said, "Congress shall have power to provide for organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the Confederate States, reserving to the States respectively the appointment of the officers and the authority of training the militia according to the discipline prescribed by congress."   Another provision of the constitution is to the following effect:   "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."   This latter provision was one of the amendments to the constitution of the United States, proposed by congress and ratified by the States, for the purpose of meeting the objections that were made to the constitution as it came from the hands of the convention, on the ground that the rights of the people were not sufficiently secured by it.   The clause which gives to congress the power to provide for calling forth the militia, and for organizing, arming and disciplining them, are precisely the same as those contained in the constitution of the United States.

When the subject of the militia was under discussion in the federal convention which framed the constitution of the United States, a long and interesting debate transpired, with which the students of our political history are familiar, and which need not be quoted extensively.   It was proposed by Mr. Sherman to strike out the clause reserving to the State the right to train the militia. Mr. Ellsworth remarked, that the objection would apply as well to the reservation to the States of the appointment to offices, and doubted the propriety of striking out either.   Mr. King said, that by *organizing*, the committee meant proportioning the officers and men,—by *arming*, specifying the kind, size and calibre of arms—

and by *disciplining*, prescribing the manual exercise, evolutions, &c. Mr. Gerry said, the power in the United States, as explained by Mr. King, would make the States drill-sergeants. He had as lief let the citizens of Massachusetts be disarmed, as to take the command from the State, and subject them to the general legislature. It would be regarded as a system of despotism. In the progress of the debate, Mr. Madison moved to amend the clause relating to the appointment of officers, as follows: "reserving to the States, respectively, the appointment of the officers, *under the rank of general officers.*" Mr. Sherman considered this as absolutely inadmissible. He said, that if the people should be so far asleep as to allow the most influential officers of the militia to be appointed by the general government, every man of discernment would rouse them by sounding the alarm to them. Mr. Gerry said, let us at once destroy the State governments, have an executive for life, or hereditary and a proper senate, then there would be some consistency in giving full powers to the general government; but as the States were not to be abolished, he wondered at the attempts that were made to give powers inconsistent with their existence. He warned the convention against pushing the experiment too far. Mr. Madison said, "as the greatest danger is that of disunion of the States, it is necessary to guard against it by giving sufficient powers to the common government; and as the greatest danger to liberty is from large standing armies, it is best to prevent them by an effectual provision for a good militia." Mr. Madison's amendment was rejected by a vote of eight States to three, or of nine to two, it is not certain which. On the question to agree to "the reserving to the States the appointment of the officers," it was agreed to without a dissenting vote. I think this statement of the debate, (and all contemporaneous expositions,) shows most conclusively that the framers of the constitution of the United States intended to reserve to the States such a control over the militia as would make the States secure against the encroachments of the general government, and as would enable the people to maintain their liberties. And I consider the proposition which asserts a distinction between the citizen and the militia-man as too shallow a sophism to require the use of argument to expose

Ex Parte Coupland.

it. The militia is the militia of the States respectively, and not of the Confederate States, or of the United States. This is clear, from the constitutions of each. "The president shall be commander-in-chief of the army and navy of the Confederate States, and of the militia of the several States, when called into the actual service of the Confederate States." When the militia are called into the service of the general government, they become national militia after they are mustered at the place of rendezvous designated by the proper authority, and not until then, as was decided by the Supreme Court of the United States, in the case of Houston v. Moore, 5th Wheaton. The Supreme Court of the United States also decided, in the case of Martin v. Mott, 12th Wheaton, that it belongs exclusively to the president to judge when the exigency has arisen, in which he has authority, under the constitution and laws, to call forth the militia, and that his decision is conclusive upon all other persons. My views, then, of the war power of the general government are these: Congress may raise regular armies by the voluntary enlistment of the citizens; the States have consented to this, and they cannot, therefore, without a violation of their constitutional obligations, prohibit the citizens from voluntarily enlisting in the regular army. The congress may provide for calling out the militia to execute the laws, to suppress insurrections, and to repel invasions, and may authorize the president to decide when the exigency has arisen. The president may call out the militia by requisitions upon the governors of the States, whose duty it would be to cause the call to be obeyed; or, perhaps, the president might transmit his orders directly to the proper officers of the militia in the respective States. The militia may be drafted into the service, under their proper officers, appointed by the State, and they may be punished if they refuse to obey the draft. They may be kept in service as long as the necessities of the case may require, and under such system of discipline as may be provided by law. Each State may exempt from militia duty all such persons as the State may deem necessary to its own government; and the right to exempt is in the State, and is not a matter of grace on the part of the general government. This question of the right of exemption was discussed when the con-

gress of the United States first provided for the organization of the militia; and I understand the Act of 1792 to recognize the principle, (undoubtedly correct,) that the right is in the State; for that Act exempts the officers and certain employees of the United States, and also "all persons who now are, or may hereafter be, exempted by the laws of the respective States." Such is the war power of the general government. It is the power which those who framed the government thought proper to commit to it, and it is enough for every possible emergency.

These are my views upon this great question. Though they are the result of much reflection, they have been somewhat hastily expressed, and I am sensible that they lack order and condensation. I have stated them under a profound conviction that I am not equal to the great argument. I feel, at the same time, a conviction as profound, that if republican government and civil liberty survive the great struggle in which we are now engaged, which I do not permit myself to doubt, some Marshall or Mansfield will make the argument which will consign the Acts of conscription which have been under discussion, to the universal obloquy which they deserve. I shall not, therefore, indulge in any vain regret that I have not the powers necessary to set this momentous question in a clear light, but shall content myself with the consciousness of having performed my duty, in my place, and according to my abilities.

WHEELER, C. J. I concur in the opinion delivered by Mr. Justice Moore. I express this concurrence in order that there may be no misapprehension as to my opinion as to the real question involved in the case and the grounds of the decision.

The expression simply of my concurrence might suffice. And it might suffice to dispose of the argument upon martial law to say, there is no question of martial law properly arising for discussion in the case.

But the observations indulged in the dissenting opinion of Mr. Justice Bell concerning the bill of exceptions and martial law, render it proper that I should advert briefly to my action and rulings upon the hearing, in order to prevent misapprehension as

to my own opinion and rulings. And to a proper understanding of these rulings, it is material to observe that the object of the proceeding upon habeas corpus is to set the complainant free from present illegal restraint. It is immaterial whether the original caption was lawful or unlawful. If at the time of the return of the writ, the defendant shows a legal cause for restraint, then imposed, the prisoner will not be discharged, notwithstanding the original taking may have been without any legal authority.

There was in this case no pretence that at the time of the return, or of the service of the writ, the complainant was detained under martial law, or by any other authority than as a soldier, called into the service of the Confederate States under the act of congress, known as the conscription law. Whether his original arrest and detention was legal or not, was then wholly immaterial, since he had been discharged from that restraint; and the only question was whether the return showed good cause for his then detention, he having been enrolled as a conscript; whether the law under which he was detained as a soldier was constitutional. It was my opinion that the law was constitutional; and it was upon this ground alone that I remanded him into the custody of the officer. This being manifestly the only question proper to be decided or considered, I excluded all evidence offered by the complainant to bring into discussion the proceedings attending the original arrest under martial law, as wholly irrelevant and immaterial. If any wrong had been done the complainant in the matter of the original arrest; if a trespass or false imprisonment had been committed, this proceeding could not afford a remedy for such injury already overpast; the remedy must be sought in a different proceeding. Hence I declined to hear evidence touching any proceedings under the order of the provost martial. There was and could be no question of martial law in the case. Yet the counsel for the complainant seemed to suppose that there was, or at least to wish to make it a question; and in order to afford the complainant the utmost benefit of his appeal in the estimation of his counsel, and them the opportunity to be heard in this court upon every question they might see proper to urge in his behalf, I gave the bills of exceptions in the terms in which they were drawn and presented by his counsel

embracing that question. If I had thought proper to enter upon the investigation of a question not properly arising in the case for decision, the information requisite to its due consideration was not accessible. We had no authentic information of the action of congress upon the subject, or the policy the government had deemed it necessary to adopt for the safety of the army, and its own self-preservation. Mail communication with the seat of government had been interrupted, and intercommunication almost wholly suspended. My information, from sources deemed reliable, was that congress had authorized the declaration of martial law, and that it had accordingly been declared by authority of an act of the Confederate Congress. If so, the decision of the Supreme Court of the United States in the case of Luther v. Borden, (7 Howard U. S. C. R., 1,) then before me, was a direct authority in favor of its constitutionality. In view of that decision, sanctioned by the venerated name of Chief Justice Taney, who delivered the opinion of the court, and who, it will be remembered, on a recent memorable occasion, was the first to raise his voice against the usurpation of the present federal executive in suspending the writ of habeas corpus without authority of law, and without authentic information not accessible, as to the action of congress, sitting, not as a court to pronounce an authoritative decision, but as a single judge in vacation, I did not think proper to pronounce against the authority of congress to declare, or authorize the declaration of martial law. Nor do I deem the present an appropriate occasion to express a judicial opinion upon that question. It will become the province of this court to decide upon the constitutional powers of a co-ordinate department of the government, when a case is presented calling for a decision. It is proper, however, to say, that it now appears that the declaration of martial law in this State was not, as was at the time supposed, by authority of any act of congress; and it is now conceded on all hands that it was unauthorized. The only legislation it seems by congress, authorizing its declaration, was the act of the 27th of February, 1862, which provided that "during the present invasion of the Confederate States, the president shall have power to suspend the writ of habeas corpus in such cities, towns, and military districts as shall in his judgment be in such

Ex Parte Coupland.

danger of attack by the enemy, as to require the declaration of martial law." As was said by the judiciary committee of the house, on a subsequent occasion, this act either assumed that the president had authority, without the aid of legislation, to declare martial law, or it was designed to confer that authority. The president so understood it; for it is well known that he proceeded to exercise the authority by declaring martial law in several places. Subsequently, in consequence of abuses, the subject elicited investigation. Congress modified its former legislation on the subject, and it is now doubtless better understood than formerly by both the civil and military authorities. I had no doubt of the constitutionality of the conscription law; and as an appeal was to be taken from my decision, and my opinion on the hearing in vacation could have no weight as authority, or effect beyond the present disposition of the case, in view of the extraordinary circumstances existing in this community and vicinity at the time, too well known to require mention here, I declined to hear argument. Under the attending circumstances, I saw no good but only harm that could come of the discussion.

I have thought proper to say this much explanatory of my action and rulings upon the hearing, to prevent misapprehension as to my opinion and the course I should deem proper ordinarily to pursue on such an occasion. Under different circumstances I should certainly have heard argument; and I might have stricken from the bills of exceptions matter which I deemed wholly immaterial and irrelevant to the case. If I did not do so on this occasion, it was for reasons which I thought sufficient at the time, and from a wish to give the party the benefit of every question his counsel might suppose could possibly be of advantage to him on the final hearing. This has now been accorded to the party. And our conclusion upon the only question properly arising in the case for decision, has been announced in the opinion of the majority of the court upon reasons so fully, and to my mind satisfactorily presented by my associate, as to render it unnecessary that I should add more than the expression of my concurrence.

Judgment affirmed.

28

Note. By Ch. J. Wheeler. In the case of Luther v. Borden, Chief Justice Taney delivering the opinion of the court, and referring to the act of the legislature of Rhode Island declaring martial law throughout the State, holds this language:

"Unquestionably a military government established as the permanent government of the State, would not be a republican government, and it would be the duty of Congress to overthrow it. But the law of Rhode Island evidently contemplated no such government. It was intended merely for the crisis, and to meet the peril in which the existing government was placed by the armed resistance to its authority. It was so understood and construed by the State authorities. And, unquestionably, a State may use its military power to put down an armed insurrection too strong to be controlled by the civil authority. The power is essential to the existence of every government—essential to the preservation of order and free institutions, and is as necessary to the States of this union as to any other government. The State itself must determine what degree of force the crisis demands, and if the government of Rhode Island deemed the armed opposition so formidable and so ramified throughout the State as to require the use of its military force, and the declaration of martial law, we see no ground upon which this court can question its authority."

The court accordingly decided, that under the authority of martial law an officer might lawfully arrest any one who he had reasonable grounds to believe was engaged in the insurrection, and might order a house to be forcibly entered and searched when there was reasonable grounds for supposing he might be there concealed. (7 Howard, S. C. R., 45, 46.)

Such was the opinion and decision of the Supreme Court of the United States in a case which excited much attention at the time. That it was deliberately, and not hastily or inconsiderately decided, is manifest from the fact that Mr. Justice Woodbury delivered a most able and elaborate dissenting opinion, reviewing the whole subject, and denying the constitutional power of the legislature to declare martial law.

Judge Woodbury deduces his conclusion thus: "The necessities of foreign war, it is conceded, sometimes impart great powers both as to things and persons. But they are modified by those necessities, and subjected to numerous regulations of national law, and justice, and humanity. These, when they exist in modern times, while allowing the persons who conduct war some necessary authority of an extraordinary character, must limit, control, and make its exercise, under certain circumstances and in a certain manner, justifiable or void, with almost as much certainty and clearness as any provisions concerning municipal authority or duty. So may it be in some extreme stages of civil war. Among these, my impression is, that a state of war, whether foreign or domestic, may exist, in the great perils of which it is competent, under its rights and on principles of national law, for a commanding officer of troops under the controlling government, to extend certain rights of war, not only over his camp, but its environs and the near field of his military operations, (6 American Archives, 186,) but no further or wider. (Johnson v. Davis, et al., 3 Martin, 530, 531.) On this rested

Ex Parte Coupland.

the justification of one of the great commanders of this country and of the age, in a transaction so well known at New Orleans." (Ibid. 83.)

I cite these because the principal judicial opinions I have met with on the subject. It is one of great moment, involving the powers of the government and the liberty of the citizen, which has no safeguard but in the supremacy of law. It is a subject, too, which the history of this country, until recently, had given but little occasion to investigate. And hence, when the occasion arose in a time of great public danger, the subject was not so well under stood, nor the limits of the legitimate exercise of power as well guarded as since the unwarranted powers assumed in some instances have challenged a more thorough investigation and understanding of the subject by congress and the country. Since congress has been called upon to revise its own legislation on the subject, conceded now to have been at first not well considered, the judiciary committee of the House have made a report in which the subject has been examined and some general views presented, which appear to have been approved by congress. The committee concluded that as laws can be suspended only by the law making power, and as all the legislative power of the Confederate States is vested by the constitution in congress, it follows that no law can exist by the authority of the Confederate States unless it be enacted by congress. " And in whatever sense martial law may be declared, (they say,) the power to declare or authorize it seems to belong exclusively to the legislature, whether of a State or of the Confederate States." "If martial law over the people be necessary in any case, it should be regulated and defined in a sense consistent with the constitution by distinct enactments." It is conceded that the necessities of war may sometimes impart extraordinary powers to military commanders. Such instances are referred to in the opinion of Mr. Justice Woodbury. But these seem to be the cases contemplated in the observations above quoted. Whenever, therefore, a case shall arise under the legislation of congress, it will become the province of the judiciary to decide whether such legislation is warranted by the grant of powers in the constitution.

In any view, the difficulty seems to be to define what is meant by martial law. If by it is meant a power to exalt the military above the civil authority, or to supersede the latter by the former, no one would contend for such a power in any officer or department of the government; for that would be in manifest violation of the constitution, which must ever be held paramount, and in subordination to which all power must be exercised as well in war as in peace. But unless what is meant by martial law be defined in advance, it would seem difficult to pronounce either that it can, or cannot constitutionally be declared or enacted. And the only test to which any legislation which may be had on the subject can be applied, is its conformity to the constitution, which, of course, cannot be done in advance of, or without knowing what that legislation is.